IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────────

VINCE AMOROSO,

                Plaintiff,                OPINION AND ORDER

    v.

                                                15-cv-119-wmc

DALE R. SCHUH, KENNETH ERLER, PETER
McPARTLAND and JAMES PEARSON,

                Defendants.
───────────────────────────────────────────────────────────

In this lawsuit, plaintiff Vince Amoroso asserts defamation claims against four former colleagues at Sentry Insurance, a Mutual Insurance Company, arising out of a memorandum circulated among Sentry's Board of Directors ("the Board"). The memorandum purported to apprise the Board of potential issues arising under the attorney-client privilege using three different "scenarios," each involving an unnamed "Director X." Defendants have moved to dismiss on three grounds: (1) the statements forming the basis for plaintiff's defamation claims are incapable of having defamatory meaning; (2) the statements at issue are subject to the common interest privilege; and (3) plaintiff's alleged injury is not cognizable under defamation law. (Dkt. #24.) Although a close question in light of the context and arguably innocuous indirect nature of the defamatory statements, the court will nevertheless deny defendants' motion for the reasons set forth below.

ALLEGATIONS OF FACT

A.  **The Parties**

Plaintiff Vince Amoroso is a citizen of Florida, where he resides. From 2003 until 2014, Amoroso served as a member on the Board of Directors of Sentry Insurance, which has its principal place of business in Stevens Point, Wisconsin.

Defendants Dale R. Schuh, Kenneth Erler and Peter McPartland all reside in and are citizens of Wisconsin, as well as officers of Sentry Insurance during the times relevant to this lawsuit. Schuh was the Chief Executive Officer of Sentry and Chairman of its Board; Erler was Sentry's Senior Vice President, Chief Administrative Officer and General Counsel; McPartland was Sentry's President, later succeeding Schuh as Chief Executive Officer and Chairman of the Board. Finally, defendant James Pearson is a citizen of Illinois and was Chairperson of Sentry's Governance Committee during the times relevant to this lawsuit.[1]

B.  **Board Membership**

Amoroso was a member on Sentry's Board from 2003 until 2014, for which he received about $200,000 per year in compensation. Between 2003 and 2012, Amoroso was elected to consecutive three-year terms, consistent with Sentry's Governance Committee customary practice of recommending to re-elect a Board member whose term is expiring at a regularly scheduled Board meeting in November. At a meeting in the following February, the Board would then "perfunctorily adopt[] the recommendation of

---

[1] This court has diversity jurisdiction under 28 U.S.C. § 1332, since plaintiff is not from the same state as any defendant and the amount in controversy exceeds $75,000. *See Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 676 (7th Cir. 2006).

the Governance Committee." (Compl. (dkt. #1) ¶ 53.) Finally, during a meeting the following April, the Board's selections are typically re-elected.[2] (*Id.*)

With respect to his own qualifications, Amoroso has been a practicing actuary for more than 40 years. He became a member of Sentry's Audit Committee in 2003, chairing it between 2006 and 2011. Amoroso further asserts that until his removal in 2014, Sentry's Board of Directors had consistently included an actuary as a member since the early 1980s.

## C. The Attorney-Client Privilege Memorandum

After a Board meeting on February 26, 2012, Amoroso alleges that defendants Schuh or Erler developed three "scenarios," each involving a director referred to only as "Director X." Those scenarios were then set forth in a memorandum titled "Application of the Attorney-Client Privilege," which was attached to another a memorandum titled "Overview of the Attorney-Client Privilege and Work Product Doctrine." (Defs.' Opening Br. Ex. A (dkt. #25-1) ECF 2.) An accompanying cover letter explains that the two memoranda were being circulated in response to requests by "a number of Directors" after the February 26 Board meeting for "updated information relating to the handling of sensitive information, and the Attorney-Client Privilege." (*Id.*) The cover letter further explains that "[t]he second memo applies these concepts in specific situations and is self explanatory." (*Id.*)

---

[2] To support his assertion that Board members are typically re-elected, plaintiff provides a table of recent board members, several of whom he alleges have served for at least twelve years. (Compl. (dkt. #1) ¶ 13.)

3

Despite the expressly stated purposes of the memoranda, plaintiff nevertheless asserts that the three scenarios "were prepared with false statements of fact in order to disparage [him] and with the purpose . . . [of] inducing members of the Governance Committee and Board of Directors to remove or not re-nominate [him] to the Board[.]" (Compl. (dkt. #1) ¶ 17.) Although the second memorandum only named a generic "Director X," plaintiff further asserts that the recipients knew he was the individual to whom the memorandum referred. (*Id.* at ¶ 16.)

D.  **The Three Scenarios**

In the opening scenario set forth in the second memorandum, Director X "uses unfortunate terminology describing [an] actuarial methodology" in emails sent to auditors outside of the company, which is involved in litigation with the IRS. (Compl. (dkt. #1) ¶ 18.) Plaintiff alleges that when he complained this scenario was inaccurate, Erler informed him that Director X's use of "unfortunate terminology" is actually referring to Amoroso's use of the term "cushion" in a first draft of a memo. (*Id.* at ¶ 19.) Plaintiff asserts that this first scenario is still misleading because (1) "cushion" was removed in the final version of the memo and (2) the term was used to describe terminology in the insurance industry, not an actuarial methodology. (*Id.* at ¶ 23-24.)

In the memorandum's second scenario, Director X calls an outside attorney acquaintance to discuss his concerns with the fees paid by one of the company's benefit plans to an affiliated provider. (*Id.* at ¶ 25.) Plaintiff alleges that this scenario is also based on his actions and is likewise misleading. Specifically, plaintiff claims Schuh encouraged him to call the attorney to discuss risks that Amoroso had identified at a

meeting. Also, plaintiff alleges the discussion with the attorney concerned a particular "immunization" strategy Sentry that was then considering, not whether the provider's fees were reasonable. (Compl. (dkt. #1) ¶ 32.)

In the third scenario, "Director X sends emails to other directors" after a Board meeting considering changes in measures to evaluate management performance, which "lay[es] out in detail his reasons for dissenting at the regular meetings, and further explain[s] why he feels the [performance] measures being used are either not complete or otherwise not proper." (*Id.* ¶ 33.) As with the first two, plaintiff alleges that this scenario was intended to reflect his conduct, though inaccurately. Instead, plaintiff alleges that Schuh called him, along with the other members of the Board, to ask whether he had any concerns regarding any Board matter. (*Id.* at ¶ 35.) After reporting his concerns and suggestions, plaintiff claims Schuh asked him to prepare a memo, which he then discussed with defendant Pearson. (*Id.* at ¶ 36.) Plaintiff further alleges that Pearson told him to send the memo to the chair of the relevant committee and to copy Schuh. (Compl. (dkt. #1) ¶ 36.) These facts, plaintiff asserts, render the third scenario inaccurate to the point of being "defamatory," since it implies that Amoroso sent emails reporting his concerns to other Board members on his own volition.

E.  **Fallout from the Memorandum**

Plaintiff alleges that Pearson, as Chairperson of the Board's Governance Committee, sent the privilege memoranda containing the three scenarios to every member of Sentry's Board on March 26, 2012. On April 6, 2012, Sentry's Senior Vice President Erler told Amoroso that he prepared the scenarios based on information

5

provided by Schuh. On that same day, Amoroso claims he advised the Chairperson of the Board and CEO Erler that the scenarios were untrue, and Erler said he would correct the false statements, but never did so.

On April 8, 2012, Pearson also asked Amoroso to draft a short memo for the Board to "correct" any inaccuracies in each scenario. The next day, Amoroso sent the memo to Pearson's wife and asked her to relay it to Pearson. At some point between April 9 and April 27, 2012, Pearson then asked to meet with Amoroso. This meeting with Pearson and Peter Pestillo, another member of the Governance Committee, took place on April 27. At that meeting, Amoroso was informed that the Governance Committee would *not* correct the scenarios.

Plaintiff claims that as a result of these scenarios, he was only re-nominated in November of 2012 and re-elected in April of 2013 to a one-year Board term, rather than the typical three-year term. After the same thing happened at the Board meeting the following November, 2013, Amoroso asked Pestillo why he was only being nominated for a one-year re-election, rather than three years, to which Pestillo allegedly responded that "the reason was continued concern about the Scenarios." (Compl. (dkt. #1) at ¶ 48.) The next year, November of 2014, Pearson and Pestillo told Amoroso shortly before the Board meeting that the Governance Committee would not be re-nominating Amoroso at all. The committee made that same announcement at the meeting, and Amoroso was not re-elected.

Plaintiff generally alleges that Schuh created the false scenarios for the purpose of defaming him and that Sentry's President McPartland caused Erler and Pearson not to

6

correct the misleading scenarios, although all three knew they were inaccurate. (*Id.* at ¶ 58.) Plaintiff attributes defendants' actions to Schuh and McPartland's desire to replace him on the Board with someone who would not challenge their management policies, a desire that he alleges Erler and Pearson were aware. (*Id.* at ¶ 59-60.) Plaintiff further contends that such actions were not without precedent, since McPartland, with the help of Erler, orchestrated the removal of another Board member who questioned McPartland's management in 2013. (*Id.* at ¶ 62.) Finally, in further support of his allegations concerning defendants' motives, plaintiff claims that the "current lead Director," Pestillo, told him that the Board needed someone with "social media marketing skills" and that it was logistically simpler to replace him rather than add another director to the Board. (Compl. (dkt. #1) at ¶ 66.)


OPINION

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief can be granted." *Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1013 (W.D. Wis. 2008). In "[e]valuating the sufficiency of the complaint, [the court] construes it in the light most favorable to the nonmoving party, accept[s] well-[pleaded] facts as true, and draw[s] all inferences in her favor." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013). A plaintiff need not provide detailed factual allegations, but must provide enough facts to state a claim that is plausible on its face and allow the "court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S.

7

662, 679 (2009).

Under Wisconsin law, a defamation claim that does not involve a public figure must allege three elements:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*In re Storms*, 2008 WI 56, ¶ 38, 309 Wis. 2d 704, 750 N.W.2d 739. Even if a defendant is not the original source of a defamatory statement, repeating or republishing defamatory statements made by others can still lead to liability for defamation. *Hart v. Bennet*, 2003 WI App 231, ¶ 25, 267 Wis. 2d 919, 672 N.W.2d 306 ("One who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.") (quoting Restatement (Second) of Torts § 578 (1977)).

Defendants move to dismiss the complaint on three grounds: (1) the statements that form the basis for plaintiff's defamation claim are incapable of having a defamatory meaning; (2) the statements at issue are conditionally privileged; and (3) plaintiff's alleged injury is not cognizable under the law of defamation. The court rejects each ground as set forth below.

I. **Defamatory Meaning**

"Whether a particular communication is *capable* of a defamatory meaning is a question of law." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 800 (W.D. Wis. 2006) (emphasis added) (citing *Lathan v. Journal Co.*, 30 Wis. 2d 146, 153, 140

N.W.2d 417, 421 (1966)). Dismissal is warranted only if the "communication cannot reasonably be understood as defamatory[.]" *Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10, 287 N.W.2d 747 (1980). In determining whether a statement is capable of a defamatory meaning, the court must examine the plain language of the statement "in the context of the communication as a whole." *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2011 WL 1206768, at *6 (W.D. Wis. 2011) (citing *Westhy v. Madison Newspapers, Inc.*, 81 Wis. 2d 1, 6, 259 N.W.2d 691 (1977); *Frinzi v. Hanson*, 30 Wis. 2d 271, 276, 140 N.W.2d 259 (1962)). To be defamatory, a statement's plain meaning must tend to harm the plaintiff's reputation "so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Hart*, 2003 WI App 231 at ¶ 21.

Here, plaintiff alleges that false statements were made about *him* in each of the three scenarios purporting to reflect actions of a hypothetical director, but written so as to make him easily identifiable to the recipients of the memorandum as "Director X." A statement does not need to explicitly name a particular individual to be defamatory as long as it "refers to a person whose identity is ascertainable." *Wildes v. Prime Mfg. Corp.*, 160 Wis. 2d 443, 448, 465 N.W.2d 835 (Ct. App. 1991); *cf. Ogren v. Emp'rs Reinsurance Corp.*, 119 Wis. 2d 379, 382, 350 N.W.2d 725 (1984) ("[O]ne who publishes defamatory matter concerning a group or class of persons is liable to an individual member only if (a) the group or class is so small that the matter can be reasonably understood to refer to the member, or (b) the circumstances of publication give rise to the conclusion that there is particular reference to the member.") (citing Restatement

9

(Second) of Torts § 564A (1977)); Restatement (Second) of Torts § 564 cmt. d (1977) ("The fact that the author or producer states that his work is exclusively one of fiction and in no sense applicable to living persons is not decisive if readers actually and reasonably understand otherwise.").

Whether Amoroso is ascertainable in the scenarios presents a much closer question than in *De Witte v. Kearney & Trecker Corp.*, 265 Wis. 132, 60 N.W.2d 748 (1953), in which the Supreme Court of Wisconsin held that a letter referencing every member of a group of four officers of a union to which the individuals who received the letter belonged could be defamatory. *Id.* at 137-38. Accordingly, plaintiff's reliance on *De Witte* only takes him so far. That said, plaintiff's allegations that the recipients would have reasonably known that the hypothetical director was intended to refer to him are sufficient at this stage, although not by much. Plaintiff's argument that the recipients of the memorandum containing the scenarios were able to "triangulate" him because each concerned a "Director X," instead of say "Director X," "Y" and "Z" is relatively weak, but plaintiff also alleges that each of the scenarios were based on similar statements he made in the presence of other Board or committee members, although misleadingly so, it is arguable that the recipients could have reasonably inferred that "Director X" was actually Amoroso. Additionally, plaintiff alleges that at least one member of the Governance Committee told him that he was only renewed for one year, rather than the typical three, because of lingering concerns generated about him by the scenarios memo. These allegations, while far from ironclad, are enough to support a reasonable inference that Amoroso was ascertainable as Director X in each of the three scenarios.

In addition to being attributable to Amoroso, however, the statements in the scenarios must also be capable of harming his reputation in order to be actionable. Plaintiff argues that the three scenarios misleadingly implied that, respectively: (1) he used terminology in an email to an outside party that could be used against the company in future litigation; (2) he called an outside attorney to address matters that could potentially result in a waiver of the attorney-client privilege; and (3) he independently sent an email to other Board members that arguably contain admissions of the company contemplating illegal activity. Admittedly, plaintiff must read somewhat between the lines of the actual, "hypothetical" scenarios to tease out these allegedly defamatory statements, but "[o]ne may be libeled by implication and innuendo quite as easily as by direct affirmation." *Frinzi v. Hanson*, 30 Wis. 2d 271, 277, 140 N.W.2d 259 (1966).

The court agrees with plaintiff that each of these statements may reasonably lower his reputation, at least as he alleges Board members would interpret them, since they each implicate trustworthiness, professional judgment and appreciation of confidentiality and fiduciary duties. *See Converters Equip. Corp. v. Condes Corp.*, 80 Wis. 2d 257, 263, 258 N.W.2d 712 (1977) (words charging dishonorable, unethical or unprofessional conduct are capable of a defamatory meaning). Defendants argue that plaintiff's interpretation of the scenarios is "unnaturally sensitive and forced" because they presented at worst an anonymous individual who did not "fully appreciate the scope of the attorney-client privilege and the potential waiver issues" (Defs.' Opening Br. (dkt. #25) at 7), but particularly when read in combination, the scenarios could reasonably suggest impairment of professional judgment in a manner more material than defendants

are willing to acknowledge. Defendants also argue that read in context, no recipient would consider the scenarios to even implicitly refer to any actual events or misconduct committed by any particular director, much less plaintiff, since the memo was designed to address requests for legal advice about the scope of the attorney-client privilege by presenting specific applications of that privilege. Fair enough, but again context matters; otherwise defamatory statements cannot be rendered non-actionable simply because they are incorporated into a larger communication having a proper purpose.

Defendants further argue that the statements to which plaintiff points cannot be defamatory because they served a valid business purpose, citing *Rubenstein v. University of Wisconsin Board of Regents*, 422 F. Supp. 61 (E.D. Wis. 1976). In *Rubenstein*, the district court granted a motion to dismiss because the defendant's opinion that the plaintiff was "not suitable for promotion" was "fair comment and not slanderous." *Id.* at 64. This case is distinguishable from *Rubenstein*, however, since instead of claiming that the scenarios were intended to convey an opinion about whether Amoroso was suitable for the director position, defendants argue that the scenarios did not refer to any specific individual and were intended not to opine on plaintiff's individual conduct, but to be instructive generally. Of course, defendants may well be able to establish a "valid business purpose" exception on summary judgment by presenting undisputed facts that the authors of the memorandum were offering innocent scenarios without plaintiff in mind for the Board's general edification *or* derived scenarios very much with plaintiff's conduct in mind for the Board's specific edification. As to the latter, plaintiff may also have a difficult time proving on summary judgment the scenarios were *materially*

12

misleading, since he at least proposed the questionable language in scenario 1, and apparently engaged in the conduct attributed to him in scenarios 2 and 3 as an independent director, or closely analogous conduct, albeit a corporate officer. At this stage, however, plaintiff has adequately alleged that the statements he identifies are capable of being defamatory, if just barely.

**II.     Common Interest Privilege**

Next, defendants move to dismiss plaintiff's defamation claims on the basis of the common interest privilege. The common interest privilege protects "defamatory statements . . . which are made in furtherance of common property, business, or professional interests" and is extended to partners and officers of a corporation. *Zinda v. La. Pac. Corp.*, 149 Wis. 2d 913, 923, 440 N.W.2d 548 (1989) (citing Restatement (Second) of Torts § 596 cmt. d (1977)). A defendant loses the protection of the common interest privilege, however, when he abuses it. *See id.* at 924. Generally, abuse of the common interest privilege occurs when the publisher knows the defamatory matter is false or recklessly disregards that possibility or when he or she publishes it for some improper purpose. *See id.* at 924-25 (citing Restatement (Second) of Torts § 596 cmt. a (1977)).

Although perhaps ultimately defendants' strongest defense, a request that the court find the common interest privilege applies as a matter of law is premature. Since the conditional privilege is an affirmative defense, plaintiff need not overcome it with the allegations in his complaint. *See Quinn v. Overnite Transp. Co.*, 24 F. App'x 582, 586 (7th Cir. 2001); *Emiabata v. Marten Trans., Ltd.*, 574 F. Supp. 2d 912, 919 (W.D. Wis. 2007)

(citing *Wisconsin v. Gilles*, 173 Wis. 2d 101, 496 N.W.2d 133, 138 (Ct. App. 1992)). Rather, the burden of proof on the question of whether the conditional privilege applies only shifts to the plaintiff after the court determines that defendants are correct that a conditional privilege exists. *Zinda*, 149 Wis. 2d at 926; *see also Calero v. Del Chem. Corp.*, 68 Wis. 2d 487, 499, 228 N.W.2d 737 (1975).

The parties dispute whether a district court can find that the common interest privilege exists and dismiss a case at the pleading stage on that basis, with defendants citing *Verfuerth v. Orion Energy Systems, Inc.*, 65 F. Supp. 3d 640 (E.D. Wis. 2014), and plaintiffs citing *Wesbrook v. Ulrich*, 90 F. Supp. 3d 803 (W.D. Wis. 2015), as well as *Emiabata*. Regardless of which party has the better argument, however, the court agrees with plaintiff that he has sufficiently alleged facts to support a reasonable inference that defendants abused the common interest privilege for their own purposes, as opposed to those of the company, making dismissal based on that privilege at this preliminary stage inappropriate. Specifically, plaintiff alleges that defendants knew about the falsity of the statements in the scenarios before publishing them and sought to force plaintiff off of the Board of Directors because he was too critical of their management of the company. At this stage, those allegations are enough for plaintiff to survive defendants' motion to dismiss, although the court would be remiss not to point out that plaintiff will likely encounter significant difficulty in overcoming the common interest privilege after further development of the record as well.

### III. Cognizable Injury

Finally, defendants argue that plaintiff has not alleged a cognizable injury because, like the plaintiff in *Quinn*, he focuses on the loss of his position rather than reputational harm. In *Quinn*, the Seventh Circuit affirmed the district court's dismissal of the plaintiff's defamation claim because while the loss of his job resulting from a superior's accusation that he was sleeping on the job was "certainly an injury," it was "not a harm to reputation compensable under defamation law," since "a single accusation of tardiness does not rise to the level of actionable harm to reputation." 24 F. App'x at 586. Tempting though it may be, the court is again unable to dismiss plaintiff's claims at the motion to dismiss stage, because unlike in *Quinn*, the multiple, allegedly defamatory statements made by defendants here were arguably severe enough to state a claim for reputational harm, not just the loss of his position on the Board. *See Converters Equip. Corp.*, 80 Wis. 2d at 263; *Wesbrook*, 90 F. Supp. 3d at 812 ("[F]alse information about a climate of fear and intimidation and administrative and leadership failures arguably are obviously capable of a defamatory meaning, since both create a poor working environment for employees and indicate a deficient management style, which could easily harm one's professional reputation.").

ORDER

IT IS ORDERED that:

(1) defendant's motion to dismiss (dkt. #24) is DENIED; and

(2) the matter is referred to Magistrate Judge Stephen Crocker to set an expedited schedule for any remaining discovery, summary judgment deadline and trial.

Entered this 30th day of September, 2017.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge